UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-80661-CV-MIDDLEBROOKS
CASE NO. 12-80211-CR-HURLEY (MIDDLEBROOKS)
MAGISTRATE JUDGE REID

OSVALDO DOMINGO CEBALLO,

     Movant,

vs.

UNITED STATES OF AMERICA,

     Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE
## FOLLOWING EVIDENTIARY HEARING RE
## MOTION TO VACATE - 28 U.S.C. § 2255

### I. Introduction

Movant, **Osvaldo Domingo Ceballo,** initially *pro se,* and later represented by privately retained counsel, filed the instant Amended Motion to Vacate pursuant to 28 U.S.C. § 2255, attacking the constitutionality of his convictions and sentences for conspiracy to possess with intent to distribute five kilograms or more of cocaine and possession with intent to distribute five kilograms or more of cocaine, entered following a jury verdict in **Case No. 12-80211-Cr-Hurley (Middlebrooks)**. [CV ECF No. 7]. This cause has been referred to the Undersigned pursuant to 28 U.S.C. § 636 and S.D. Fla. Admin. Order 2019-02. [CV ECF No. 21].

The Undersigned has reviewed the filings in this case, the Presentence Investigation Report ("PSI"), together with all pertinent portions of the underlying criminal case. For the reasons detailed below, the Amended Motion should be **DISMISSED** as untimely, and alternatively, **DENIED** on the merits.

- 1 -

## II. Claims

Movant raises the following two grounds for relief:

1.  His attorney, Richard Diaz, Esquire, was ineffective for misadvising him about the benefits of accepting the Government's plea offer as opposed to proceeding to trial. [CV ECF No. 7 at 4].

2.  His attorney, Richard Diaz, Esquire, was operating under an actual conflict of interest which adversely affected his representation of the Movant. [CV ECF No. 7 at 5].

Because **Claim 1** was not conclusively refuted by the record and "alleges facts that, if true, would entitle him to relief," an evidentiary hearing was held on February 4 and 5, 2020. *See* 28 U.S.C. § 2255(b); *see also Martin v. United States,* 949 F.3d 662, 669 (11th Cir. 2020) (internal citations omitted).

## IV. Threshold Issue-Timeliness

Before considering the merits of Movant's claims, the Court must first determine whether Movant's § 2255 case was timely filed within the one-year limitation period established for filing such claims. *See* 28 U.S.C. § 2255(f).  "Because a fundamental purpose of § 2255 is to establish finality in post-conviction proceedings, the one-year limitation period for filing a § 2255 motion is mandatory and unequivocal." *Trucchio v. United States,* 553 F. App'x 862, 863 (11th Cir. 2014) (citing *Jones v. United States,* 304 F.3d 1035, 1039-40 (11th Cir. 2002)). The one-year statute of limitations to file a motion to vacate begins to run on the latest of four possible triggering events:

(1)    the date on which the judgment of conviction becomes final;

(2)    the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3)     the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)     the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

As background, Movant was found guilty, following a jury trial, of conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1)-(b)(1)(A)(iii), 846, and 18 U.S.C. § 2 (Count 1), and possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2). [CR ECF Nos. 196, 574]. He was sentenced to 216 months of imprisonment. [CR ECF No. 603].

He appealed, raising numerous claims of trial and sentencing court errors. *See United States v. Ceballo,* 632 F. App'x 604 (11th Cir. 2016. [CR ECF No. 830]. The Eleventh Circuit Court of Appeals *per curiam* affirmed the conviction and sentence in a written, but unpublished decision. *Ceballo,* 632 F. App'x at 604, [*Id.*]. Movant's petition for writ of certiorari was denied by the United States Supreme Court on **October 3, 2016.** *Ceballo v. United States,* 137 S. Ct. 162 (2016), [CR ECF No. 834]. Thus, Movant's judgment of conviction became final on **October 3, 2016,** when the Supreme Court denied certiorari review. *See Gonzalez v. Thaler,* 565 U.S. 134, 149-50 (2012); *see also Phillips v. Warden,* 908 F.3d 667, 672 (11th Cir. 2018). As a result, at the latest, Movant was required to file this motion to vacate by **October 3, 2017**. *See* 28 U.S.C. § 2255(f)(1); *see also Griffith v. Kentucky,* 479 U.S. 314, 321 n.6 (1986); *Downs v. McNeil,* 520 F.3d 1311, 1318 (11th Cir. 2008).

On **May 8, 2018,** over seven months after the one-year limitation period had expired, Movant filed the initial Motion to Vacate in this case. [CV ECF No. 1 at 12]. Movant later filed a counseled Amended Motion on June 13, 2018. [CV ECF No. 7 at 13]. The claims raised in the

amendment relate back to the initial Motion. *See Davenport v. United States,* 217 F.3d 1341, 1344 (11th Cir. 2000).

The Government argues in its Response to the Court's Order to Show Cause and in its post-hearing Memorandum that Movant's Motion to Vacate is time-barred pursuant to 28 U.S.C. § 2255(f), because it was not filed within a year from when his conviction became final, and Movant has not demonstrated that he exercised due diligence in discovering the facts supporting his claims. [CV ECF No. 17 at 13-16; CV ECF No. 54 at 4-9]. Movant does not dispute that his Motion is untimely under § 2255(f)(1). [CV ECF No. 7 at 12; CV ECF No. 46 at 1-8]. He maintains, however, that the Motion is timely pursuant to 28 U.S.C. § 2254(f)(4), because it was filed within one year of when he discovered the facts to support his claim regarding counsel's purported conflict of interest. [*Id.; Id.*].

Movant argues that his motion is timely under § 2255(f)(4), because he did not learn of the factual predicate of his claims until October 2017. [CV ECF 7 at 12; CV ECF 46 at 1-8]. The Government argues that Movant has failed to demonstrate he exercised due diligence in discovering the factual predicate of his claims. [CV ECF No. 17 at 15-16; CV ECF No. 54 at 3-9]. Movant testified at the evidentiary hearing held regarding this issue that "around mid-year 2017" he and his daughter, Stephanie Ceballo Monico ("Monico"), learned from a family member that Richard Diaz, his trial counsel, had previously represented Jose Sigler, one of Movant's co-defendants. [CV ECF 52 at 13]. Sigler had pled guilty and had testified against Movant at trial. As discussed below, Movant has not demonstrated that he took reasonable efforts to discover the factual predicate of his claims, much less that he exercised due diligence once he became aware of the facts supporting the claims.

a. *Applicable Law*

- 4 -

Pursuant to 28 U.S.C. § 2255(f)(4), the limitations period begins to run from "the date on which the facts supporting the claim . . . could have been discovered through the exercise of due diligence." *Lanier v. United States,* 769 F. App'x 847, 849 (11th Cir. 2019) (*per curiam*) (quoting *Aron v. United States,* 291 F.3d 708, 711 (11th Cir. 2002)). If the Court determines Movant exercised due diligence, then "the limitations period begins to run on the date he actually discovered the relevant facts." *Id.* (quoting *Aron,* 291 F.3d at 711). If, however, the Court determines Movant "did not exercise due diligence, a court is required to speculate about the date on which the relevant facts could have been discovered." *Id.* (quoting *Aron,* 291 F.3d at 711 n.1).

The "due diligence" standard "does not require the maximum feasible diligence," nor the undertaking of "repeated exercises in futility," but it does require Movant "to make reasonable efforts in discovering the factual predicate of his claim. *Aron,* 291 F.3d at 712 (citing *Wims v. United States,* 225 F.3d 186, 190 n.4 (2d Cir. 2000)). "Moreover, the due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system." *Id.* (quotations and citations omitted).

"[T]he one-year period begins on the first day the evidence becomes reasonably available, thus giving the movant one year to request, obtain, review, and incorporate any new information into a § 2255 motion." *Trucchio*, 553 F. App'x at 864 (citing 28 U.S.C. § 2255(f)(4)). However, "there is a distinction between: (1) the date on which the evidence objectively becomes reasonably amenable to discovery . . ., and (2) the date on which the movant subjectively believes that he could physically access the material." *Id.* (citing *Aron,* 291 F.3d at 711).

- 5 -

b. *Relevant Evidentiary Hearing Testimony*

(i) *Movant's Testimony*

Movant's testimony was unclear as to when he first learned of Diaz's prior representation of his codefendant. Movant testified at the evidentiary hearing that sometime in "mid-year 2017," he first learned that Diaz had represented coconspirator, Jose Sigler ("Jose"), after his daughter contacted a "realtor family member" of Jose's, who told them of the relationship between Diaz and Jose. [CV ECF 52 at 13]. Movant claims he learned of this information from a conversation he had with his daughter around the same time period. [*Id.* at 54, 65]. Movant could not recall when post-conviction counsel, Attorney Joseph Rosenbaum was hired, but he "believes" he told his daughter to go to Rosenbaum's office as soon as they discovered this information. [*Id.* at 13, 54, 66]. Movant did confirm that Rosenbaum had already been retained to file a motion to attempt to reduce Movant's sentence based on changes to the federal guidelines. [*Id.* at 55]. Movant testified, however, that because he was in prison, his family "handled everything for him." [*Id.* at 14].

He next testified that the prior relationship between Diaz and Jose was not officially confirmed until October 2017 when his daughter received a document from Jose's family confirming that Diaz had previously represented Jose in a Broward County civil forfeiture case. [*Id.* at 14-15]. Movant testified he never saw the document, but his daughter sent it to his wife, Teresa Ramirez, in October 2017. [*Id.* at 55, 60-62]. According to the Movant, his wife would have personally delivered a copy of the document to Rosenbaum's office. [*Id.* at 63].

Regarding his relationship with Jose, Movant testified that he met Jose about twenty years ago, explaining that Jose was a customer of Movant's boat repair shop. [*Id.* at 16-17]. Movant testified that, at the time, their relationship was "good" and that Jose brought him "lots of work."

[*Id.*]. Eventually, they became "close friends," and Jose was considered "family." [*Id.* 17-18]. Movant also confirmed Jose was the godfather of one of his children, and that they would "go out once in a while with the wives." [*Id.* at 18].

(ii) *Monico Testimony*[1]

Movant's daughter's testimony of the timeline of discovery of the prior representation was more specific. She testified she first learned that Diaz had represented Jose in February 2017, after her grandmother received a telephone call from Jose's half-brother, Amado ("Amado") Egued. Egued told her grandmother that Diaz, had previously represented Jose. Monico's grandmother immediately conveyed this information to Monico, and asked her if they could hire an attorney to pursue the issue. At the time, Monico was unaware of the type of case in which Diaz had represented Jose, but testified she immediately hired Rosenbaum in February 2017 to represent her father.[2]

She testified that Attorney Rosenbaum indicated he hired a private investigator, but they could not locate a document confirming Diaz had previously represented Jose. She confirmed receipt of a November 5, 2017 e-mail from Rosenbaum indicating that Jorge Alonso, a private investigator, was hired and on February 28, 2017, ran "a comprehensive background report" on all of Jose's cases in every county, but "it turned up nothing." A copy of the e-mail was introduced at the hearing as Movant's Exhibit 3. In that e-mail, Rosenbaum explained that it was not until October 6, 2017 that Monico advised him that the nature of Diaz's representation of Jose involved a civil forfeiture case and provided him with the case number. He then obtained a copy of the court

---

[1] Monico's testimony has not been formally transcribed and made part of the record. The narrative contained herein is a summary of her testimony as recalled by the Undersigned.

[2] The docket of the underlying criminal case confirms that Rosenbaum entered a Notice of Appearance on August 16, 2017 to pursue a reduction in Movant's sentence based upon 18 U.S.C. §3582. [CR ECF No. 842].

docket, but it failed to list Diaz as Jose's counsel, and after requesting the file from the Clerk's office, Rosenbaum was advised the file had been misplaced.

Monico testified she then contacted John Sigler ("John"), Jose's brother, in an effort to obtain documentation of Diaz's prior representation. Monico also confirmed she not only had Amado's contact information, but also had John's. Monico explained that when Amado agreed to provide her with the documentation, she believed he would be e-mailing them to her, but instead, Amado sent them to his nephew, John, who then e-mailed it to her on October 20, 2017.

Monico confirmed that, attached to John's e-mail was an October 20, 2017 receipt from the Broward County Clerk's office, together with an Amended Final Order of Forfeiture and handwritten notes that the civil forfeiture case file had been destroyed in 2015 and "that there were no copies of the docket entries except for the recorded final order." The October 20, 2017 e-mail, together with the attachments were introduced at the hearing as Movant's Exhibits 4-7. At the end of John's e-mail he advised Monico that, she "could subpoena us and we will admit that he represented us." *Id.* at Ex. 4. Monico confirmed she e-mailed the attachments to Rosenbaum that same day. The final Order of Forfeiture entered in Jose's case confirmed that a copy was mailed to Movant's counsel, Diaz.

During cross-examination, Monico admitted that Jose and his family had a "close" relationship with her father and her family, but it became "strained" because of Movant's case. She also admitted that she possessed Amado's phone and e-mail address since February 2017, but it was not until she reached out to Amado directly in October 2017, when Rosenbaum could not confirm Amado's allegations, that she obtained the court document establishing Diaz's previous representation of Jose from Jose's family. It was, however, John, Jose's son, who e-mailed her the documents, which she then forwarded to Rosenbaum.

Monico at first confirmed that prior to receiving the documentation "her family" had not thought about nor discussed hiring someone to file a § 2255 Motion. At the time, "the family" was "not under the impression" that a Motion would be filed. It was not until they actually received the information from Amado that they thought about hiring an attorney to file a Motion to Vacate. Later, Monico equivocated stating that even if they had not received the information from Amado, she is sure her father would have filed a § 2255 Motion.

c. *Discussion Re Timeliness*

It is initially worth mentioning that none of the e-mails or attachments provided to Movant and/or his family by Jose's family and relied upon by Movant at the evidentiary hearing, as noted above, were made part of Movant's initial or Amended Motion to Vacate. They were first discussed and introduced at the evidentiary hearing, well after the Government had filed its Response to the Amended Motion.

In any event, given the testimony adduced at the evidentiary hearing, the Undersigned finds *Trucchio* instructive in determining when the evidence in this case became "reasonably available" thereby giving Movant "one year to request, obtain, review, and incorporate any new information into a § 2255 motion." *Trucchio*, 553 F. App'x at 864.

It is uncontroverted that Movant's daughter learned about the facts to support the claims raised in Movant's § 2255 proceeding in February 2017, after her grandmother received the information during a phone conversation with Amado. Monico's conversation with her grandmother and their retention of Rosenbaum during that same month to investigate the issue demonstrates that, at best, the facts were discoverable in February 2017, thereby commencing the one-year period on that date. Monico admitted that Jose's family knew of the representation, had told her of it and had agreed to confirm the representation under oath. *See id.* By Movant's own

admission, his family handled all matters concerning the retaining and filing of his § 2255 Motions. The Undersigned finds highly suspect and disingenuous Movant's representation that he was unaware of the nature of the claim until late October 2017.

Thus, under § 2255(f)(4), the Undersigned finds the limitations period began in February 2017, when the information regarding Diaz' prior representation of Jose became reasonably available. As a result, Movant had until February 2018 to timely file this § 2255 Motion. *See* 28 U.S.C. § 2255(f)(4); *see also Trucchio,* 553 F. App'x at 864. Although "maximum feasible diligence" is not required, "due diligence" requires that a prisoner make "reasonable efforts" to discover the factual predicate of his claim. *Aron,* 291 F.3d at 712.

Movant has not demonstrated that he acted diligently in pursuing his rights. It is not when Movant discovered objective proof of the facts, in October 2017, but when those facts were "reasonably amenable to discovery" which triggered the commencement of the one-year period. Thus, the Undersigned finds the one-year period was triggered, at the latest, in February 2017, and expired one year later, at the end of February 2018. Therefore, the filing of the initial Motion in May 2018 is time-barred. *See Trucchio,* 553 F. App'x at 864 (citing *Aron,* 291 F.3d at 711). Thus, this case should be DISMISSED as untimely.

Alternatively, for the reasons more fully discussed below, after considering the merits of Movant's claims, Movant is not entitled to relief.

## V. General *Strickland* Standard of Review

It is well settled that a criminal defendant is entitled to the effective assistance of competent counsel under the Sixth Amendment. *See Strickland v. Washington,* 466 U.S. 668, 686 (1984). In order demonstrate that counsel was ineffective, Movant must prove: (1) counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the

defense. *See id.* at 687-688, 692. If Movant cannot meet one of the *Strickland's* prongs, the court does not need to address the other prong. *See id.* at 697; *see also Brown v. United States,* 720 F.3d 1316 (11th Cir. 2013).

To show deficient performance, a movant must demonstrate that "no competent counsel would have taken the action that his counsel did take." *Gordon v. United States,* 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted). In the guilty plea context, to show prejudice, the movant must establish that, but for counsel's deficient performance, "there is a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). Prejudice in the sentencing context requires a showing that the sentence would have been less severe. *See Glover v. United States,* 531 U.S. 198, 203-04 (2001).

A movant, however, is not prejudiced by counsel's failure to raise non-meritorious claims. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014). Courts may not vacate a conviction or sentence solely because the outcome would have been different, but for counsel's error, as it may grant the defendant a windfall which he is not entitled to under the law. *See Lockhart v. Fretwell,* 506 U.S. 364, 369-70 (1993); *see also Allen v. Sec'y, Fla. Dep't of Corr.,* 611 F.3d 740, 754 (11th Cir. 2010).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." *Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). The *Strickland* test does not require a showing of what the best or good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. *See Dingle v. Sec'y for Dep't of Corr.,* 480 F.3d 1092, 1099 (11th Cir. 2007). In retrospect,

- 11 -

where counsel's decision appears to have been unwise, it will have been ineffective only if it was "so patently unreasonable that no competent attorney would have chosen it." *Id.* (citation omitted).

## VI. Discussion

### A. Misadvice Rearding Plea Versus Trial

In **claim 1**, Movant asserts that Diaz misadvised him regarding the benefits of accepting the Government's plea offer versus going to trial. [CV ECF No. 1 at 4; 13; CV ECF No. 7 at 4]. Movant claims he was advised telephonically by counsel that the Government was offering a fifty-seven-month sentence if Movant pleaded guilty to the conspiracy charge. [CV ECF No. 7 at 4]. According to the Movant, Diaz "insisted" that Movant go to trial because the only "adverse evidence" against him was Jose's testimony, which counsel would "nullify" at trial. [*Id.*]. He claims counsel insisted there was a "lack of evidence" to support the charges, which "meant that the only choice was to go to trial." [*Id.*]. Movant maintains he was misled by this advice and would not have rejected the plea offer if he had known that Diaz, "burdened by a conflict, could not fully impeach and undermine [Jose] Sigler" and if he had known there was "abundant evidence" corroborating Jose's testimony and proving Movant's guilt. [*Id.*]. Movant believes that Diaz could not mount a compelling defense to impeach Jose because he had previously represented him. [*Id.*]. Movant suggests that counsel's conflict of interest caused Movant to "misunderstand" and "undervalue" the Government's favorable plea offer. [CV ECF 46 at 11-12]. He states "the plea offer and advice by Diaz were not confirmed by emails or letters. . ." [*Id.*].

The Government argues that Movant "was never going to accept" any of its plea offers. [CV ECF 17 at 19]. The Government attached copies of e-mails demonstrating that both counsel - Diaz and Santisteban - urged Movant to accept the Government's last plea offer since new developments in the case made Movant's chance of winning at trial "slimmer than ever." [*Id.*].

The Government further argues that both attorneys met with Movant and his wife to discuss the plea offer, but Movant "chose" to ignore their "sound advice." [*Id.*].

Relative to this claim, at the evidentiary hearing the Court heard testimony from Movant, his daughter, Monico, his former defense attorneys, Carlos Santisteban, Jr., Esquire ("Santisteban") and Diaz, and the former prosecutor, Assistant United States Attorney, Jennifer Nucci ("AUSA Nucci").[3] The e-mail correspondence and testimony presented during the evidentiary hearing leads the Undersigned to conclude that Movant had determined to reject the Government's plea offers, insist upon his innocence, and proceed to trial, despite his counsel's advice.

1. Applicable Law Re Misadvice of a Plea

Notably, "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky,* 559 U.S. 356, 373 (2010) (citing *Hill,* 474 U.S. at 57; *McMann v. Richardson,* 397 U.S. 759, 770-71 (1970)). The *Strickland* two-part test applies to ineffective assistance of counsel claims relating to advice regarding whether to plead guilty or proceed to trial. *See Osley v. United States,* 751 F.3d 1214, 1222 (11th Cir. 2014) (citing *Hill,* 474 U.S. at 57-59). In *Frye*[4] and *Lafler,*[5] the Supreme Court also extended the right to effective assistance of counsel "to the negotiation and consideration of plea offers that have lapsed or are rejected." *Osley,* 751 F.3d at 1222 (quoting *In re Perez,* 682 F.3d 930, 932 (11th Cir. 2012)(per curiam)).

---

[3] Only the excerpt testimonies of Movant and Diaz have been made part of the record. *See* CV ECF Nos. 52-53. Thus, page citations to the testimony will only be noted where available as to these witnesses.
[4] *Missouri v. Frye,* 566 U.S. 134, 145 (2012).
[5] *Lafler v. Cooper,* 566 U.S. 156 (2012).

Thus, "as a general rule, defense counsel has a duty to communicate formal [plea] offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye,* 566 U.S. at 145. Deficient performance under the Sixth Amendment is established where defense counsel allows such an offer "to expire without advising the defendant or allowing him to consider it." *Frye,* 566 U.S. at 145. Therefore, counsel is obligated to advise his client of "the advantages and disadvantages" of the proposed plea. *Padilla,* 559 U.S. at 370 (finding counsel was deficient for failing to advise a defendant that a guilty plea carries a risk of deportation) (quoting *Libretti v. United States,* 516 U.S. 29, 50-51 (1995)).

The prejudice prong is the same under *Strickland,* but rather than focus on the fairness of the trial, it "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea." *Hill,* 474 U.S. at 59. When an ineffective assistance claim concerns the misadvice or rejection of a plea offer, Movant must establish that: (1) he would have accepted the government's plea offer; (2) the prosecution would not have withdrawn the plea as a result of intervening circumstances; (3) the court would have accepted its terms; and, (4) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that, in fact, were imposed. *See Osley,* 751 F.3d at 1222 (citations omitted).

In *Osley*, the Eleventh Circuit found a movant could not show prejudice based on counsel's failure to advise him that he faced a mandatory minimum sentence because his "claim that he would have pled guilty had he been properly informed [was] . . . undermined by his repeated claims of innocence." *Id.* at 1224. A movant's "conclusory after-the-fact-assertion that he would have accepted a guilty plea, without more, is insufficient to demonstrate an entitlement to relief." *Teers v. United States*, 739 F. App'x 960, 966 (11th Cir. 2018) (*per curiam*) (citations omitted).

2. <u>Evidentiary Hearing Testimony</u>

a. *Diaz's Testimony*

Diaz, an experienced defense attorney, testified he has known Movant for approximately fifteen to twenty years, explaining that he first represented him in an unrelated state civil forfeiture case. [CV ECF No. 53 at 3-9, 10, 11]. Diaz recalled that after Movant was arrested on the federal charges, Movant's wife contacted him, and he agreed to file a temporary appearance for purposes of the initial and pretrial hearings, until they could discuss a retainer agreement. [*Id.* at 11, 14].

Diaz also recalled raising successful arguments at Movant's pre-trial detention hearing, which resulted in Movant's release on an "affordable bond," although the Government tried to have it revoked unsuccessfully. [*Id.* at 16]. Based on the Government's proffer at the hearing, Diaz believed the case was "triable" because of a lack of evidence. [*Id.* at 15-17]. In order to "gain traction" with the government, Diaz explained he filed a motion for speedy trial, believing the Government would be unable to "marshal up" their case in time to obtain a conviction. [*Id.* at 18].

Diaz next testified that after Movant was released on bond, he was at first represented by court-appointed counsel until Movant was able to make financial arrangements with him, at which time he then filed a permanent notice of appearance. [*Id.* at 19-20]. Diaz explained that Movant had agreed that the representation and fee agreement included both Diaz and his associate, Attorney Santisteban, who would be handling the "grunt work" with Diaz's supervision, and that Diaz would handle the evidentiary hearings and trial. [*Id.* at 21-22].

Diaz testified that during the initial phase of the representation, he explained to Movant the option of going to trial versus pleading guilty. [*Id.* at 23]. Diaz was unequivocal that it is his custom to do so with all clients. [*Id.*]. As it relates to Movant, he recalled explaining the evidence proffered by the Government before the magistrate judge and the significance of the fact that the government

had taken over a year to indict him. [*Id.*]. At the time, Diaz advised Movant they should get the case "trial-ready." [*Id.*]. If he had been asked at the time if he could have "won the case," Diaz testified that he would have said "yes" absolutely and would have told that to the Movant. [*Id.*].

Later in 2013, Diaz explained that his opinion about the "defensibility" of the case changed because the government's case had become stronger. [*Id*. at 24, 40-41]. Diaz recalled advising Movant about his exposure under the "draconian application of the guidelines," the possibility of enhancements to the guidelines for leadership and obstruction of justice, and reductions for safety valve, together with the statutory maximums he faced upon conviction. [*Id.* at 24-26]. Diaz opined that it was really important for a defendant to understand the "big gap of the exposure" arising from the consequences of losing in a federal criminal trial, regardless of the strength or weakness of a case. [*Id.* at 26]. Diaz was unequivocal that he never had a doubt that Movant understood the nature and contents of their discussions. [*Id.*]. If there had been any doubt as to Movant's ability to understand him, he would have requested a competency evaluation. [*Id.* at 27].

Diaz testified that it was Movant's position he was "going to go to trial no matter what." [*Id*. at 27, 78]. From the outset, Movant made it "clear" he wanted to go to trial, claiming he was "innocent." [*Id.* at 78]. He believes Movant's desire to go to trial was also based in part on the fact that he was "overconfident" in Diaz's skill as a lawyer, having previously successfully represented the Movant in state forfeiture and criminal cases, and successfully gotten him released on bond when no other co-conspirator had been granted a bond. [*Id.* at 27].

Diaz also testified that whenever the Government provided discovery in the case, it was provided to the Movant and reviewed meticulously by Diaz's associate, and then by Diaz. [*Id.* at 40]. Diaz also recalled preparing and filing, with Santisteban's assistance, a motion to suppress, seeking to exclude evidence and post-arrest statements. [*Id.* at 28-29]. Specifically, the evidence

concerned a piece of paper, referred to by the Government as a "ledger," which by itself was "useless," but "considering the tie-ins" Diaz opined it "could be very damaging." [*Id.* at 29]. After refreshing his recollection, Diaz testified that the court granted Movant's motion in part, suppressing one of Movant's statement, but allowing the other statement and ledger to be introduced at trial. [*Id.* at 31].

After the suppression proceedings concluded, on October 24, 2013, Diaz instructed Santisteban to reach out to the Government to inquire as to their position on entertaining a negotiated plea. [*Id.* at 32-33]. Diaz advised his associate to suggest the case could be resolved if the Government would agree to recommend a U.S. Sentencing Guidelines § 5K1.1 variance resulting from co-conspirator Oliva's guilty plea. [*Id.* at 34]. After Santisteban did so, the Government rejected the proposal by e-mail, introduced as Government's Exhibit 22, stating it did not believe "a 5K is appropriate or warranted." [*Id.*]. Santisteban forwarded the e-mail on that same day to Diaz. [*Id.*].

Diaz testified that the government instead proposed a plea offer that resulted in a recommended guideline range of seventy to eight-seven months of imprisonment. [*Id.* at 34]. Based on prior conversations with the Movant, Diaz told his associate "no deal," because they were not authorized to accept a plea that resulted in that length of imprisonment. [*Id.* at 34-35]. Nonetheless, he instructed his associate to schedule Movant to come to the office as quickly as possible to discuss the plea. [*Id.* at 35].

Diaz recalled that, in 2013, a guideline range based on 19.1 kilos of cocaine results in a base offense level thirty-four, with a three-point reduction for acceptance of responsibility, it is reduced to a level thirty-one, and a criminal history category I, results in a potential exposure of 108 to 135 months of imprisonment. [*Id.* at 36-38]. In order to reduce the guideline range down to

seventy to eight-seven months, the Government was agreeing to an additional four-level reduction to Movant's base offense level. [*Id.* at 38-39].

In 2014, as the case got closer to trial, Diaz again personally engaged in plea negotiations with the prosecutor. [*Id.* at 42]. After discussions with his associate about the accumulating Government inculpatory evidence being disclosed as the case got closer to trial, Diaz dictated and had his secretary send on his behalf the February 12, 2014 e-mail to the Movant, introduced as Government's Exhibit 25. [*Id.* at 42-43]. Diaz acknowledged this was an "unusual case," because the Movant was "adamant about [his] innocence," and "about wanting to go to trial." [*Id.* at 44]. Because the evidence in the case had gotten so much stronger, Diaz wanted to detail why his opinion about the case had changed so dramatically. [*Id.*].

In that e-mail, Diaz explained and highlighted the new evidence, and advised Movant he was down to a twenty percent chance of success at trial. [*Id.*]. He further advised Movant about negotiating a plea which would allow him to argue for a variance if his co-conspirator pleaded guilty as well. [*Id.*]. Counsel recalled being overly optimistic, explaining to the Movant if they were successful and the Court granted the variance, this may result in a range of three to five years. [*Id.* at 45].

After sending the e-mail, Diaz met with Movant soon thereafter, as trial was a couple of weeks away. [*Id.*]. Because Movant resided in Naples and was on electronic monitoring, Diaz had his secretary coordinate the office visit with Movant and his probation officer, as reflected in the e-mails and letters introduced as Government's Exhibit 27. [*Id.* at 46-48].

According to Diaz, the meeting to discuss the government's last plea offer was held February 19, 2014. [*Id.* at 46, 48]. Diaz testified it was a "real, real serious meeting," that lasted "about four hours." [*Id.* at 48]. Diaz was "pretty sure" Movant's wife was also present at that

meeting. [*Id.* at 49]. Finally, Diaz confirmed that, at 5:10 p.m. he sent the prosecutor an e-mail, introduced as Government's Exhibit 28, stating "Well, after several hours with Ozzie [Movant] and his wife his decision is to proceed to trial." [*Id.* at 49-50].

Next, Diaz recalled that, about a week after that meeting, he received a supplemental discovery response from the prosecutor on February 27, 2014, attaching a fingerprint report which positively identified Movant's print on the ledger seized from the Movant's car. [*Id.* at 51].

Diaz testified that he dictated and had his secretary send on his behalf the February 27, 2014 e-mail [Government's Exhibit 37] to the Movant memorializing the Government's final settlement offer, in which they extended a plea offer which would result in a low end guideline range of fifty-seven, and which left Movant the possibility of still being able to argue for a variance, although counsel did not believe they would win the variance argument. [*Id.* at 52-53]. He then advised Movant to remember that, while the judge was "the ultimate decision-maker" regarding the sentence, it was his "strong opinion" that Movant would "very likely" end up with a fifty-seven month sentence. [*Id.* at 53]. Diaz further stated that he "strongly recommended" that Movant accept the offer, especially in light of the Government's "new evidence" which they had recently discussed. [*Id.*]. According to Diaz, Movant rejected this final offer because he thought he was "going to win," notwithstanding the Government's newly discovered evidence, and continued insisting on his actual innocence. [*Id.* at 93].

Because Movant continued to deny guilt, professing his innocence, and he had Diaz "pretty convinced," Diaz had Movant undergo a polygraph examination. [*Id.* at 27-28, 87-88]. At the time, Diaz recalled praying and being hopeful that Movant would "pass" the exam. [*Id.* at 88]. Diaz explained that polygraphs have a margin of error, being only eighty-seven percent reliable. [*Id.*]. The margin of error increases with the number of different questions asked. [*Id.*]. The tighter the

question, the more reliable the result. [*Id.*]. As a result, Diaz testified he had the examiner ask Movant one question--"Did you know there was cocaine in the trunk of the vehicle?" [*Id.* at 85]. Movant responded, "No." [*Id.*].

According to Diaz, the exam was not without risks because if Movant failed and he decides to testify at trial, it could present an ethical issue regarding the potential for perjury, etc. [*Id.* at 89-90]. Diaz explained he only polygraphs his clients if he thinks the client is going to pass the exam and it can then be used to obtain dismissal of the charges or to negotiate a lesser charge. [*Id.* at 90]. In Movant's case, the polygraph exam did not prove to be helpful. [*Id.*].

When asked whether he was lead counsel at trial, Diaz said he tried the case, and only allowed his associate to do "opening statement" which he had "probably" written out for him. [*Id.* at 56]. Diaz confirmed cross-examining the cooperating witness, explaining that, as he does in all his cases, he opens cross-examination by asking the witness whether or not they have ever met or spoken before about the case. [*Id.*].

Diaz testified that at no time did he "recognize" the name "Jose Sigler." [*Id.* at 57]. The first time he actually saw Jose was at some point during Movant's trial, when he was called to testify by the Government. [*Id.* at 58]. Diaz also testified that, at the time, he also did not recognize Jose, nor did Jose indicate he recognized counsel. [*Id.*]. During Jose's cross-examination, he tried to establish that Jose had gotten a "great break" even though the case involved nineteen kilograms of cocaine. [*Id.* at 59]. Diaz testified he had wanted to expose Jose's prior drug offenses, but the Government had indicated that if he attempted to do so, Jose was going to implicate the Movant in one of those priors. [*Id.*]. As a result, Diaz strategically determined to "back off," and let the co-defendant cross-examine Jose as to his prior bad acts. [*Id.* at 59-60]. Thus, he believed that the

information regarding Jose's prior drug offenses was brought to the jury's attention without implicating the Movant. [*Id.* at 59-61].

Diaz first learned of the allegation that he had previously represented Jose when he reviewed Movant's § 2255 Motions. [*Id.* at 61]. At the time, Diaz thought "it was a mistake," a "false allegation." [*Id.*]. He recalled asking his secretary whether they had ever had a client named "Jose Sigler," and instructing her to do a search for that name in their system, which yielded a "Close-Out Statement of Account," introduced as Government's Exhibit 32. [*Id.*]. When his secretary mentioned Amado's name along with Jose's, he remembered the case involved a forfeiture matter. [*Id.* at 73].

At that time, he realized Movant was correct and he had, in fact, represented Jose in 2005, ten years prior to Movant's trial. [*Id.* at 62]. He could not remember Jose because "Sigler" was not as uncommon as "Egued." [*Id.* at 73]. In fact, Diaz testified that he knows two individuals with the last name "Sigler," his wife's dentist and an attorney. [*Id.*].

In preparing for the hearing, Diaz pulled all documents [Government's Exhibit 38] that remained in their "electronic system" because the "paper file" was only kept for seven years and it had long since been destroyed. [*Id.* at 62]. Diaz testified that Jose's forfeiture case involved the state seizure of approximately $105,000 in cash in Broward County, Florida arising from a vehicular stop. [*Id.* at 63-64]. Diaz explained that Amado Egued was also associated with Jose's forfeiture case. [*Id.* at 63]. He could specifically remember this because Amado was Hispanic, but his last name was Middle Eastern. [*Id.*]. According to Diaz, Jose and Amado advised him under oath that the seized money came from flipping real estate, not drug proceeds. [*Id.* at 64]. Against counsel's advice, Diaz recalled Jose and Amado agreed to settle the case for about half of the seized monies in May 2005. [*Id.* at 65]. Diaz confirmed that, other than that one isolated case, he

- 21 -

never represented Jose in any other matter, nor was he representing him during Movant's trial. [*Id.* at 66].

Diaz admitted that, had he remembered representing Jose at the time he agreed to represent Movant at the detention hearing or afterwards, he would have notified Movant first, then the Government and the Court. [*Id.* at 67]. At that time, a waiver of conflict hearing could have been held where Movant could decide whether to waive the conflict or not. [*Id.* at 67-68]. He further conceded he never told Movant that he had previously represented Jose. [*Id.* at 70].

Diaz confirmed he also previously represented Movant on state criminal charges and in 2001 on a civil forfeiture case. [*Id.* at 71]. When Movant returned over ten years later, seeking representation in the criminal case, Diaz clearly remembered Movant because Movant's $15,000 state civil forfeiture case took over a year to get to trial, he spent hundreds of hours working the case, and eventually won and received almost a half a million dollars in fees and damages. [*Id.* at 72]. On the other hand, Jose's civil forfeiture case did not go to trial, and he had only worked on that file for about five hours before it settled. [*Id.*].

During cross-examination, Diaz also confirmed that he did not run a conflict check on the witnesses that were going to testify against the Movant. [*Id.* at 73]. According to Diaz, he has a conflict check system in place to check "clients to clients," but not "clients to witnesses." [*Id.* at 74]. He would not run a conflict check to ensure that a former client was not a witness that would be testifying against a current client for numerous reasons, because the Government would disclose it or because he would recognize the name. [*Id.* at 75]. In this case, Diaz admitted he did not do a conflict check of the witnesses against his former clients. [*Id.*].

### b. *Attorney Santisteban's Testimony*

Attorney Santisteban, Diaz's associate, testified that when he opened his own law practice, he shared office space with his mentor and uncle, Diaz. He confirmed that Government's Exhibit 14 contained a copy of the May 16, 2013 Fixed Retainer Agreement ("the Retainer") executed by him, Diaz, and Movant. At the time, Santisteban testified this was the first criminal case he handled. The Retainer required Movant to pay a combined $75,000 fee, with Santisteban acting as Movant's "co-counsel" or "associate." By June 28, 2013, Santisteban had familiarized himself with Movant's file and e-mailed the prosecutor inquiring as to their position on a possible plea offer. A copy of the e-mail was introduced as Government's Exhibit 17. Because he was being mentored by Diaz, Santisteban was unequivocal that Diaz was aware of and participated in every step he took regarding Movant's case.

Government's Exhibit 35 is a screen shot reflecting the calendared dates and times of meetings with Movant. Because Movant was out on bond, Santisteban recalled Movant's probation officer had to be contacted to coordinate in-office meetings because he would have to travel outside the district, from his home in Naples to the office in Coral Gables.

Although Government Exhibits 18 and 35 confirm that a meeting with Movant was scheduled on July 11, 2013, Santisteban had no independent recollection whether he did, in fact, meet with Movant on that date. Santisteban did have a specific recollection of going through the Government's discovery with Movant, which included a lot of CDs. He also recalled that it was standard practice at the time to provide copies of discovery to clients. Santisteban testified that, as the case progressed, Movant was kept informed of any additional discovery provided by the Government. He further recalled that, at some point in time, Jose became a cooperating witness.

Santisteban corroborated Diaz' testimony that they jointly wrote Movant's motion to suppress the ledger and Movant's two statements. He too recalled the motion had been granted in part and denied in part. Santisteban was certain discussions were had with the Movant regarding the landscape of the case if the items were suppressed or if they were allowed to be introduced at trial. Santisteban explained that the denial of the motion as to the ledger was significant because the ledger contained the same phrase-words that were written on the actual kilos of cocaine. According to Santisteban, the chance of Movant prevailing at trial was much different after the Court's ruling on the motion than before. Although at the outset he believed the case was defensible, after the partial denial of the suppression motion and based on discussions with Diaz, he believed Movant should not proceed to trial.

Santisteban also testified that the "bulk" of communications with Movant was coordinated through Diaz's office. He knows he spoke with Movant on the phone a few times and believes he also sent him e-mails. Following a November 4, 2013 e-mail addressed to the Movant, introduced as Government's Exhibit 35, Movant responded using an e-mail address "ozziec70@yahoo.com" stating, "Thank you so much Carlos, please let me now if changes again I'll appreciate it."

Santisteban could not recall whether he was involved in conveying the October 24, 2013 plea offer that he forwarded by e-mail to Diaz. Santisteban testified that the snapshot of his calendar, introduced as Government's Exhibit 35, confirms that a meeting was scheduled with Movant on October 30, 2013 at 4:00 p.m., during which they would have advised him of the Government's plea offer. According to Santisteban, Movant was always pretty adamant about going to trial.

However, Santisteban explained that during every conversation with the Movant, they would have explained the benefits of accepting the government's plea offer, and the worst-case

scenario if he proceeded to trial and was convicted. He specifically recalls the Government's 2014 plea offer because he got a call from the prosecutor conveying the offer when he and his wife had just arrived at a state court judge's house to attend a fund raiser. He recalled telling his wife that Movant "had to take this deal" that involved a five-year sentence exposure. Santisteban explained he was not present when that plea was conveyed to Plaintiff because he was away on vacation.

Santisteban testified he received Diaz' February 12, 2014 e-mail making Movant aware of the three new developments in the case. Santisteban confirmed he had discussed those developments with Movant. As the case progressed, following the suppression proceeding, Santisteban discussed with Movant the fact that the Government's case was getting stronger, but Movant remained steadfast in his desire to go to trial.

Santisteban testified, consistent with his February 12, 2014 e-mail to Diaz, that there was a conversation with Movant about the possibility of pleading straight up to the court, without a negotiated plea, which he suggested to the prosecution. In response, the prosecutor advised that if Movant did so, she would seek a leadership/managerial role enhancement, which would obviously enhance Movant's sentencing range.

Regarding the last plea offer, on February 19, Diaz' secretary sent Santisteban an e-mail stating "No plea that is all I know." In response, Santisteban wrote, "Shit! Idiot!" Santisteban's response was based in part because he knew Movant had two young boys and a wife, and given the five-year plea offer, he would have been released from custody in three to four years, which was "absolutely the deal he needed to take." Santisteban testified unequivocally that Movant chose not to accept the plea offer. Santisteban also confirmed receipt of Diaz's e-mail to the Movant, dated February 27, 2014, introduced as Government's Exhibit 37, again relaying the last offer and

stating that Movant had "rejected this deal against our advice" and therefore they were "happy and ready to being trial on Monday."

c. *AUSA Jennifer Nucci's Testimony*

Assistant United States Attorney Jennifer Nucci ("AUSA Nucci") testified regarding the nature of Movant's prosecution which she explains arose from a large-scale drug importation originating in Colombia, going through Haiti, and ultimately entering the United States. Pierre Louis was the source of the drug supply and main Haitian leader. According to AUSA Nucci, it was not until June 3, 2011 that Movant was on the Government's "radar" as a result of a seven-hour surveillance during which Movant was observed with co-conspirators Oliva and Jose. On that day, three cars were driving in a pattern consistent with drug trafficking organizations. Eventually, Movant and Oliva went to a shopping center, where Oliva parked in front of a restaurant, and Movant entered a Häagen-Dazs store.

Law enforcement went to both locations. Movant was observed by the store manager throwing a cellular phone into the store's garbage. Another cellular phone was found on the Movant. Because the Government hoped not to "tip off" the investigation, they called in a canine officer, who alerted to drugs in Oliva's car, which was then impounded. When asked if he had seen Oliva, Movant stated he had not seen him that day and had not seen him in over ten years. Seized from Movant's vehicle was a ledger with Movant's fingerprint which not only connected Movant to the events but tied the entire conspiracy together.

Regarding plea negotiations, AUSA Nucci acknowledged receipt of a June 28, 2013 e-mail from Santisteban, introduced as Government's Exhibit 17, inquiring about the potential for a plea. She recalls speaking often with Santisteban on the phone, and recalled that the Government's position early on was they would not seek a role assessment, would only hold Movant responsible

for the 19.1 kilograms of cocaine seized from Oliva's car, would recommend a three-level reduction for acceptance of responsibility, and would hope that Movant would consider cooperation.

AUSA Nucci recognized Government's Exhibit 21 as her e-mail and the response that Movant did not want to plead guilty and wanted to go to trial. Although the case was set for trial in October, as of the August 24 e-mail, she had not given a cut-off date for plea negotiations. AUSA Nucci testified she would allow Movant to plead to Count 8 of the indictment, which she miscalculated would result in a sentencing range of 70 to 87 months, when it should have reflected 87 to 108 months.

### d. *Movant's Testimony*

Movant's testimony differs drastically from his counsel. He testified he was never shown the Government's discovery and was told by Diaz and Santisteban that he "was not doing anything illegal." [*Id.* at 24].

Sometime thereafter, Movant learned that co-conspirator Jose would be testifying against him at trial. [*Id.* at 18]. According to the Movant, Diaz always told him that he would "destroy" Jose during cross-examination. [*Id.*]. Movant testified that Diaz was "very competent." [*Id.* at 19]. However, Movant testified having since learned that Diaz had previously represented Jose, he would have "stopped" Diaz's representation "right there." [*Id.*]. When he first hired Diaz, he was "looking . . . for a lower sentence" than he first faced upon indictment, which he believed was about twelve and a half years. [*Id.* at 19-20].

According to Movant, he did not become aware of any plea offers until the government made an offer, four or five days prior to trial, that would result in a fifty-seven-month term of imprisonment. [*Id.* at 20, 27]. Movant testified that Diaz conveyed this offer during a telephone

conversation, about four to five days prior to trial. [*Id.* at 27]. When asked why he rejected the offer, Movant claims that Diaz had "prepared for trial," looked at all the discovery, and advised him "there was nothing there" that Movant needed to look at because he "was not involved in anything." [*Id.*]. Movant further stated that Diaz advised he could "destroy" Jose as a witness, and not to "worry about it." [*Id.*].

Movant denied receiving Government's Exhibit 25, the February 19, 2014 e-mail sent by Liz Zaharas, Diaz' secretary, on behalf of Diaz. [*Id.* at 22]. According to the Movant, he would communicate with Diaz by phone or he would meet with counsel at counsel's office. [*Id.* at 23]. Movant testified he did not think and could not remember corresponding with counsel by e-mail. [*Id.*]. Movant also denied seeing or receiving any new evidence as mentioned in that e-mail. [*Id.*].

Movant also testified that, had he known Diaz had previously represented Jose, he would have definitely accepted the Government's final plea offer. [*Id.* at 28-29]. Movant then equivocated, stating that he thinks he would have "stopped" having Diaz represent him. [*Id.*]. Before knowing about Diaz' prior representation of Jose, he had a lot of confidence in Diaz's ability to try the case. [*Id.*].

Movant admitted he met and discussed his case with counsel on three or four separate occasions, and that during one such meeting, they discussed Jose's involvement. [*Id.* at 25]. He also confirmed discussing Diaz's observations following review of the discovery as it relates to the involvement of each codefendant. [*Id.* at 25]. Movant, however, denied being shown any of the government's evidence. [*Id.*]. Movant testified that during these meetings Diaz advised there were no phone calls provided by the government in which Movant's voice was recorded. [*Id.*]. He also testified counsel did not show him any videos. [*Id.*].

Movant did recall discussing why he had two cellular phones at the time of his arrest. [*Id.* at 25-26]. He advised Diaz that he was going to fix Jose's boat, so he picked Jose up at his place of employment and was driving to Jose's home, located in a gated community, because the boat was parked behind the home. [*Id.* at 26]. Movant claims that he told Diaz that he "believes" Jose left the phones in the cup holders. [*Id.*].

Movant could not recall whether Diaz ever told him the Government had produced more evidence against him. [*Id.*]. Movant also could not recall Diaz ever telling him he only had a twenty percent chance of winning at trial. [*Id.*].

Movant was concerned about Jose testifying against him and the jury's perception of his relationship with Jose, especially since he was being charged with conspiracy. [*Id.* at 27].

During cross-examination, Movant conceded that Diaz effectively represented him in 2001 in the state forfeiture case. [*Id.* at 29-30]. He also acknowledged that during his detention hearing, the Government proffered that Movant had been caught on surveillance delivering or attempting to deliver nineteen kilograms of cocaine. [*Id.* at 33]. At the time, he overheard counsel's argument that the government's case was very circumstantial, and he was pleased that counsel was able to get him released on bond. [*Id.* at 34].

Movant conceded, however, that after his arraignment, but before hiring Diaz, he was represented by a court-appointed counsel under the Criminal Justice Act, for about six months. [*Id.* at 35]. He recalled going to that attorney's office to discuss the case and whether Movant was interested in a plea, but also denied receiving any discovery from that attorney. [*Id.*].

Regarding the Retainer, introduced as Government's Exhibit 14, Movant acknowledged that his signature, that of his mother's, and both Diaz and Santisteban were on the last page, and that the agreement was dated May 16, 2013. [*Id.* at 37]. Although the document reflected a

signature date of May 16, 2013, Movant testified repeatedly that it was not signed until October 2013 because Diaz did not come into the case until then. [*Id.* at 38-39]. He acknowledged, however, that as of May 17, 2013, he was no longer being represented by the court appointed counsel because Santisteban filed a stipulated motion for substitution of counsel. [*Id.* at 39].

Movant concedes he went to Santisteban's office and discussed the Government's discovery. However, Movant testified that Santisteban did not show him or give him copies of the discovery because counsel told him it did not establish that Movant had been doing anything illegal at the time of his arrest. [*Id.* at 40]. Movant "believes" he also told Santisteban that he did not think he had been doing anything illegal because he was never caught with the actual nineteen kilograms of cocaine. [*Id.* at 41].

Throughout the hearing, Movant equivocated in answering questions. For example, when asked if counsel discussed with him the significance of the ledger and why they were trying to get it suppressed, Movant responded "it could have been part of the conversation." [*Id.* at 42]. He further testified it was his "belief" that the ledger had not been suppressed, and "thinks" he was told it would be introduced into evidence at trial. [*Id.*].

Next, Movant testified that he did not "recall" receiving an initial Government plea off that would result in a sentence between seventy to eighty-seven months of imprisonment. [*Id.* at 43]. When asked whether he was told that the evidence was getting stronger as the case got closer to trial, Movant responded that it was "possible." [*Id.*].

Movant next testified, however, that he was told that co-conspirator Bernard was testifying against him at trial, but that his testimony "was of no significance, and he would be a weak witness." [*Id.*]. He also acknowledged being advised that Jose was going to testify against him but could not "recall" whether he was told this in October 2013 or the beginning of 2014. [*Id.* at 44].

He denies being told about the contents of Jose's testimony and the fact that he had advised law enforcement that the Movant was involved in at least one of the five drug loads he brought into the United States. [*Id.* at 51].

Between October 2013 and the beginning of 2014, Movant concedes he traveled to counsel's office, and recalled taking a polygraph exam in August. [*Id.* at 44]. When asked if he failed the test, Movant responded, "That's what I was told, yes." [*Id.*].

Movant next confirmed that one of his e-mail addresses in February 2014 was, in fact, ozziec70@yahoo.com. Movant conceded he had received the February 18, 2014 e-mail, sent to the above account, from Liz Zaharas, Diaz's secretary, introduced into evidence as Government's Exhibit 27, and responded to it. [*Id.* at 45-46]. Movant confirmed that he would receive communications at that e-mail address which he had provided to the law firm. [*Id.* at 46]. However, Movant could not "recall," receiving the February 12, 2014 e-mail sent by Liz Zaharas, on behalf of Diaz, and introduced as Government's Exhibit 25, discussing three recent developments in his case and that the chances of prevailing at trial had dropped to 20%. [*Id.* at 46]. He could also not "recall" if he was informed of these new developments at the February 19, 2014 meeting with Diaz. [*Id.* at 47-48].

Movant further denied having any discussions with counsel regarding the Government's intent to introduce at trial the phone that was thrown in the garbage at the Häagen-Dazs store. [*Id.* at 49]. Movant testified that he first "learned about the phone in the garbage" at trial and could not recall if he had previously heard it during the detention hearing. [*Id.*].

Movant confirmed he hired two attorneys, and that he had been advised that, under the federal sentencing guidelines, his range was based on a level 34 and if he had no criminal history, he would qualify for a sentence below the statutory maximum for his offense if he provided a

truthful statement. [*Id.* at 50]. Movant concedes he was aware early on that if he pleaded guilty, he could receive at least a five-level reduction to his base offense level. [*Id.*].

However, Movant continued to deny during cross-examination that he was told the Government initially offered a plea that would result in a sentence exposure of seventy to eighty-seven months of imprisonment. [*Id.*]. He did admit he was told about the Government's last fifty-seven-month plea offer. [*Id.*]. However, he decided to go to trial and not accept the plea because he was told "there was no guarantee and not to worry." [*Id.* at 51].

3. Discussion Regarding Misadvice of Plea

After careful consideration of Movant's testimony in the context of this case and close observation of his demeanor, as well as, careful attention to and review of the testimony of Diaz and Santisteban; and, taking into account the respective interests of the parties in the outcome of this proceeding, the Undersigned credits the testimony of Diaz and Santisteban that Movant never intended to plead guilty. The Undersigned finds Movant's testimony that he was continually told he had a defensible case, especially as the case got closer to trial, lacks credibility in light of the February 12, 2014 and February 27, 2014 e-mails which the court finds Movant received, and which memorialized counsel's previous advice which "strongly recommended" that Movant accept the Government's final plea offer. The Undersigned further finds Movant's testimony that, but for the fact that he was purportedly unaware that Diaz had previously represented Jose in an unrelated civil forfeiture case, he would not have proceeded to trial and would have accepted the Government's final plea offer lacks credibility. Thus, given the facts and evidence adduced at the hearings in this case, the Undersigned finds Movant's testimony implausible, incredible, and disingenuous. Therefore, Movant cannot demonstrate prejudice arising from counsel's purported deficiency during plea negotiations. *See Osley,* 751 F.3d at 1224.

What is clear from the record is that Movant at all times opted to "roll the dice," believing there was no evidence tying him to the charged conspiracy. His continued protestations of innocence during the criminal proceedings and even in this collateral proceeding, claiming there was nothing tying him to the charged offenses, undercuts his claim that he would have accepted responsibility, much less stipulated to a factual proffer of facts implicating him in the conspiracy and other offenses involving approximately nineteen kilograms of cocaine.

While it is true that a defendant's protestations of innocence before and after trial do not, in and of themselves, prove that a defendant would not have accepted a guilty plea, if properly advised, *see Lalani v. United States,* 315 F. App'x 858 (11th Cir. 2009) (citing *Griffin v. United States,* 330 F.3d 733, 738 (6th Cir. 2003), this Court does credit Diaz's testimony that all of the plea offers were conveyed to the Movant, but Movant steadfastly maintained his innocence, insisting on going to trial on the charged offenses.

Movant's post-conviction assertion that he would have pleaded guilty is not believable, nor is his representation that he would have sought different counsel. The Undersigned finds that Movant, now serving a more severe sentence, has "buyer's remorse," wanting to go back in time and accept responsibility in the hopes of obtaining a lesser sentence. But his actions before trial and his refusal to admit guilty even now clearly demonstrate that he would not have accepted any plea offer, much less admitted his guilt at a change of plea proceeding. Movant decided to take his chances at trial in the hopes of an acquittal and lost. Movant is not entitled to relief on this claim. *See Diaz,* 930 F.2d at 835.

### B. Actual Conflict of Interest Claim

In **claim 2,** Movant asserts that Diaz was burdened by an undisclosed "conflict of interest" which adversely affected Movant's trial. [CV ECF No. 7 at 5]. Movant claims Diaz represented

Jose in a civil forfeiture proceeding in Broward County Circuit Court, Case No. 05-001940, in which he was able to obtain the return of "the financial fruits of [Jose] Sigler's drug dealing. [*Id.*]. Movant maintains that counsel's awareness of the facts underlying the forfeiture case would have provided him with a basis for "impeaching" Jose. [*Id.*]. Movant claims Diaz's actual conflict of interest prevented or otherwise impeded counsel's ability to use the facts from the forfeiture case to undermine Jose's credibility. [*Id.*]. Movant also alleges that, had counsel not been operating under an actual conflict of interest, he could have elicited from Jose that Movant was not involved in Jose's prior crimes. [*Id.*].

The Government argues Movant is not entitled to relief because he cannot demonstrate that an actual conflict existed at the time of Movant's trial, much less that he was adversely affected by counsel's prior representation of Jose in a civil forfeiture proceeding which concluded in 2005. [CV ECF No. 17 at 20].

For the reasons discussed below, this claim should be DENIED.

1. Applicable Law Re Actual Conflict of Interest

"Where an ineffective assistance of counsel claim is based on a conflict of interest, a petitioner 'must show first, that his attorney had an actual conflict of interest, and second, that the conflict adversely affected counsel's performance.'" *Aguilar-Garcia v. United States,* 517 F. App'x 880, 881 (11th Cir. 2013) (*per curiam*) (quoting *Pegg v. United States,* 253 F.3d 1274, 1277 (11th Cir. 2001); citing *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980)). Where a defendant shows that an actual conflict of interest existed and it affected his representation, then he need not demonstrate prejudice in order to obtain relief. *See id.* (citing *Cuyler,* 446 U.S. at 349-50).

An "actual conflict of interest" exists when a lawyer has "inconsistent interests." *United States v. Ubieta,* 634 F. App'x 964, 975 (11th Cir. 2015) (citing *Freund v. Butterworth,* 165 F.3d

839, 859 (11th Cir. 1999) (*en banc*)). Thus, in order to demonstrate that an actual conflict hindered defense counsel's performance, Movant "must make a factual showing of inconsistent interests or point to specific instances in the record to suggest an actual impairment of his or her interests." *Id.* (quoting *Freund,* 165 F.3d at 859). The Court's inquiry into the actual conflict is "fact-specific." *See Aguilar-Garcia,* 517 F. App'x at 882 (quoting *United States v. Novaton,* 271 F.3d 968, 1011 (11th Cir. 2001)). Mere speculation or allegations of a hypothetical conflict of interest are insufficient to establish a Sixth Amendment violation. *Ubieta,* 630 F. App'x at 975 (quoting *Novaton,* 271 F.3d at 1011).

To prove the second prong of an actual conflict of interest claim - adverse effect - Movant must demonstrate the following "three elements: (1) 'that the defense attorney could have pursued a plausible alternative defense strategy'; (2) 'that this alternative was reasonable'; and (3) 'that the alternative strategy was not followed because it conflicted with the attorney's external loyalties.'" *Aguilar-Garcia,* 517 F. App'x at 882 (quoting *Novaton,* 271 F.3d at 1343). In the guilty-plea context, courts should determine "whether the attorney's actual conflict adversely affected the defendant's decision to plead guilty." *Id.* (quoting *Pegg,* 253 F.3d at 1278).

Although counsel's failure to advise a client or the court about a potential conflict of interest does not constitute a *per se* Sixth Amendment violation, the Eleventh Circuit has emphasized that counsel "should inform his clients and the presiding courts of the circumstances surrounding the potential conflict of interest." *Kennedy v. United States,* 799 F. App'x 697, 701 n.3 (11th Cir. 2020) (*per curiam*) (citing *Novaton,* 271 F.3d at 1012 n.12).

2. Discussion

As previously discussed in relation to the timeliness issue of this proceeding, Movant and his daughter testified that it was not until February 2017 that Movant and his family became aware

that Jose had previously been represented by Diaz in 2005 in a civil forfeiture case. The evidence introduced at the hearing established that Diaz's representation of Jose ended in May 2005. [CV ECF No. 53 at 62-67].

Diaz testified at the hearing that Jose and Amado Egued had represented to him, under oath, that the seized monies were derived from fixing and then reselling distressed homes. [*Id.* at 66]. In a February 28, 2005 letter to Jose and Amado, Diaz explained that the City of Pembroke Pines had offered to return forty percent of the seized monies. [Government's Exhibit 33]. In that letter, Diaz explained that "with the current real estate market, the time value of money is more significant today than perhaps in the last several decades." [*Id.*]. It is uncontroverted that Jose and Amado settled the forfeiture case years before Movant's trial. [*Id.*]. Diaz also testified that nothing in the forfeiture case would have assisted him in his cross-examination of Jose because they had represented that the monies came from a legitimate real estate business. [CV ECF No. 53 at 66].

Diaz was forthright at the hearing, admitting he did not do a conflict check to verify whether he had previously represented the Government's cooperating witness and former co-conspirator Jose. [*Id.* at 66, 70]. Had he done so at the time, Diaz further admitted he would have alerted his client, the Government, and the Court so that a waiver of conflict hearing could be had. [*Id.*at 66]. When he learned of Movant's claim, he had his secretary look up Jose's name and then both Jose and Amado's came up in the search. [*Id.* at 73]. He could not remember Jose's name because it was a common name, but he did remember Amado's because Amado was Hispanic, yet he had an unusual Mediterranean last name. [*Id.* at 73-74].

Diaz explained that his office normally does conflict checks when he is going to take on a new case if the opponent in that case is a prior client, but he does not run a conflict check in a criminal case where he is representing one defendant to verify if he has ever represented any of

the other named defendants or cooperating witnesses. [*Id.* at 75-76]. In a typical criminal case, the Government reveals any possible conflicts to the Court. [*Id.* at 74].

Diaz testified that he also did not recognize Jose when he first saw him at the time of cross-examination. [*Id.* at 58]. Diaz explained that he had prepared a "cross outline," and was trying to impeach Jose with his prior criminal activities and the fact that he had been involved in "prior drug loads." [*Id.* 75-76, 59]. Diaz recalled that, during a side-bar conference the Government had advised that if Movant brought this out during cross-examination, then it was going to have Jose implicate the Movant in one of Jose's prior drug offenses. [*Id.* at 59]. Diaz testified that, at that point, he had to decide whether to "back off" of that line of questioning or take the "good with the bad." [*Id.* at 59]. Although Diaz at first testified that the issue regarding Jose's prior drug importation was brought out during the cross-examination by co-conspirator Oliva's counsel, he later clarified he was unsure, but did not think the information was introduced, but that the trial transcripts would best reflect this. [*Id.* at 59-61]. Diaz was unequivocal, however, that he did attempt to establish through vigorous cross-examination Jose's motive for testifying, and the benefits he expected to receive from the Government for his cooperation. [*Id.*].

Review of the trial court record corroborates Diaz's testimony. The record reveals that after Diaz asked Jose whether he had distributed more cocaine during his criminal career that what was discussed during Movant's trial a side-bar conference ensued at the Government's request. [CR ECF No. 626 at 222]. The Government explained it had taken "painstaking measures not to discuss" those issues, including "one of the most significant loads," which Jose did with the Movant during their direct exam of Jose. [*Id.* at 222-23]. When Diaz attempted to explain that he was not going to delve into the prior drug load involving the Movant, the Court indicated he could not "slice it up that way." [*Id.* at 223-24]. The Court indicated it was not trying to limit cross-

examination, but if he opened the door, then the Government would be able to bring out the fact that Movant had been involved in the other drug load. [*Id.* at 223-224]. Diaz indicated he wanted the record to reveal that he had given the issue "consideration" and was withdrawing the question as a matter of "strategy." [*Id.* at 224-25].

3. <u>Discussion Regarding Actual Conflict of Interest</u>

The Court record also confirms that Diaz conducted extensive cross-examination of Jose, spanning over 100 pages, in an effort to impeach and/or otherwise discredit his testimony before the jury. [CR ECF No. 626]. Movant has not pointed to any instance in the cross-examination which was ineffective, or which rose to the level of deficiency. Moreover, Movant cannot demonstrate that counsel was ineffective for failing to "open the door" to questioning Jose regarding his prior drug trafficking ventures, especially as it would have elicited testimony implicating Movant in at least one of those prior offenses. Consequently, he has not shown that counsel was operating under an actual conflict of interest because he failed to properly cross-examine Jose, on the basis that he was a prior client. His allegations are, at best, speculative.

To the extent he suggests that the prior representation adversely affected Movant's representation because Movant could not effectively evaluate counsel's representations in relation to the favorable plea offer, this argument also warrants no relief. [CV ECF No. 46 at 10]. As discussed in relation to claim 1 above, the Undersigned finds Movant never intended on accepting any Government plea offer. He had discussions not only with Diaz, but with Santisteban regarding discovery, the strength of the Government's case as it got closer to trial, and the decision whether to proceed to trial or accept the Government plea offer. Movant chose to proceed to trial, believing he could win an acquittal.

Movant's suggestion that he would have stopped Diaz's further representation or would have, in fact, accepted the fifty-seven-month offer is rejected as incredible. Movant never intended to accept any plea, and the court has credited both Diaz and Santisteban's testimonies that Movant always insisted on going to trial, claiming he was innocent of all charges. Now, in hindsight, Movant seeks to vacate his conviction and accept a plea offer that the Court finds he previously rejected. Movant has failed to demonstrate an actual conflict. Even if one existed, he has failed to demonstrate an adverse effect for all of the reasons expressed above. Thus, he is not entitled to relief on this claim.

## C. Conclusion

For all the above reasons, this Amended Motion to Vacate is not only untimely filed, but the claims raised warrant no relief so that the Motion should alternatively be denied on the merits.

## III. <u>Recommendations</u>

It is therefore recommended that:

1.  Movant's Amended Motion to Vacate [CV ECF No. 7] be DISMISSED as untimely and alternatively DENIED on the merits;

2.  Judgment be entered in favor of the Respondent;

3.  no certificate of appealability issue in this case; and,

4.  the case CLOSED.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1 (2016); *see also* 28 U.S.C. § 636(b)(1)(C); *Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

Signed this 11th day of February, 2021.


UNITED STATES MAGISTRATE JUDGE


cc:     Courtney Montiero, Esq.
        Attorney for Movant
        The Law Office of Courtney Montiero
        2847 Hollywood Blvd.
        Hollywood, FL 33020
        Email: cmontiero@gmail.com

        Diana Margarita Acosta, AUSA
        United States Attorney's Office
        101 South U.S. Hwy 1, Suite 3100
        Fort Pierce, FL 34950
        Email: diana.acosta@usdoj.gov